# United States Court of Appeals
## For the First Circuit

---

No. 99-1679

DAVID EFRON, INDIVIDUALLY, AS A CLASS A SPECIAL PARTNER
OF ES HOTEL ISLA VERDE, S.E., A PUERTO RICO CIVIL PARTNERSHIP,
AND FOR AND ON BEHALF OF THAT PARTNERSHIP,

Plaintiff, Appellant,

v.

EMBASSY SUITES (PUERTO RICO), INC.,
EMBASSY SUITES (ISLA VERDE), INC., PROMUS HOTEL CORPORATION,
MORA DEVELOPMENT CORPORATION, FIRST BIG ISLAND STEAKHOUSE,
INC., CLEOFE RUBI GONZALEZ, MORAIMA CINTRON DE RUBI,
EMMA M. CANCIO-SANTOS, E.S. HOTEL ISLA VERDE, S.E.,
CORPORACION DE DESARROLLO HOTELERO, AND
FUNDACION SEGARRA BOERMAN E HIJOS, INC.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Boudin, Circuit Judge.

---

Guy B. Bailey, Jr. and Alan M. Dershowitz, with whom Victoria B. Eiger and Karin B. Morrell were on brief, for appellant.
Salvador Antonetti-Zequeira for appellees.

Maria del Carmen Taboas on brief for First Big Island Steakhouse, Inc., and Emma M. Cancio-Santos.

Arturo Diaz-Angueira and Roberto Feliberti on brief for Embassy Suites (Puerto Rico), Inc., Embassy Suites (Isla Verde), Inc., and Promus Hotel Corporation.

Luis Sanchez Betances on brief for Mora Development, Cleofe Rubi Gonzalez and Moraima Cintron de Rubi.

———————————

August 14, 2000

———————————

**COFFIN, Senior Circuit Judge.** Plaintiff-appellant David Efron, a member of a limited partnership formed to build and operate an Embassy Suites hotel in Puerto Rico, claims that several of his partners intentionally caused the project to experience financial difficulties in a scheme to extract additional money from him and other investors and, ultimately, to squeeze down the value of Efron's substantial interest in the partnership. Efron brought a civil suit under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), (d), and Puerto Rico law. Concluding that the allegations in the complaint did not show RICO violations, the court dismissed the federal claims and declined to exercise supplemental jurisdiction over the Commonwealth claims. See Efron v. Embassy Suites (Puerto Rico), Inc., 47 F. Supp.2d 200 (D.P.R. 1999). We affirm, agreeing with the district court that appellant has failed to adequately allege a "pattern of racketeering activity," see 18 U.S.C. § 1962(c), but adding elaboration to its rationale.

## I. Factual Background

We narrate the allegations contained in the complaint and RICO case statement in the light most favorable to appellant. See Feinstein v. Resolution Trust Corp., 942 F.2d 34, 37 (1st Cir. 1991). Efron and his associates formed the ES Hotel Isla

-3-

Verde, S.E. Partnership ("the Partnership") in 1995 to develop and operate an Embassy Suites hotel and casino in the Carolina section of San Juan, Puerto Rico. Efron contributed approximately $5 million in property and cash, receiving in return twenty-two percent of the equity in the project. Of the six other partners, four are defendants in this case: Cleofe Rubi Gonzalez ("Rubi"); his wife, Moraima Cintron de Rubi ("Cintron"); Mora Development Corporation ("MDC"), a company owned by Rubi; and Embassy Suites Isla Verde, Inc. ("ESIV"). Two other partners are described as co-victims, although they did not join Efron's suit: Corporacion De Desarollo Hotelero ("CDH"), a public corporation that is a subsidiary of Puerto Rico's Department of Tourism; and Fundacion Segarra Boerman e Hijos ("FSBH"). Also named as defendants were several corporations affiliated with the defendant partners, including Embassy Suites (Puerto Rico), Inc. ("ESPR"), a company hired by the Partnership to manage the hotel, and First Big Island Steakhouse, Inc., a Rubi-controlled company that leased space from the Partnership for a restaurant ("Outback"). Emma Cancio Santos, an attorney for ESIV and Rubi, also was named as a defendant.

Efron alleges that the defendants deliberately caused the hotel project to lose money by generating excessive construction

costs, engaging in sweetheart leases with the on-site restaurant and gift shop, overpricing rooms, and performing other acts of mismanagement. According to the complaint, ESPR purposefully created artificial cash shortfalls, which under the Partnership agreement could be covered by capital calls to the limited partners. The agreement specified that a partner who did not provide the requested capital could have his interest reduced proportionately. Efron alleges that, to protect his initial investment and avoid losing his equity, he was forced to invest an additional $1 million in response to such capital calls.[1]

Efron filed suit in October 1997. The amended complaint identified seventeen instances of alleged mail or wire fraud during a twenty-one-month period as the unlawful acts supporting a RICO claim, the first of which was a letter sent to the partners by Rubi on January 11, 1996, stating that the project was experiencing cost overruns of about $7 million. The

---

[1] The complaint elaborated on the improper practices as follows: the cost overruns allegedly resulted from (1) payments to a Rubi-owned company in excess of the value of goods and services received; (2) subcontractor bills from other Rubi projects that were shifted onto the Partnership, and (3) construction delays from the late addition to the project of the Outback restaurant. Cash shortfalls continued to build after the hotel was completed because the defendants allegedly overpriced rooms and failed to adequately market the hotel's services. In addition, the lease arrangement with Outback allegedly benefited Rubi to the detriment of the Partnership, and the lease to the hotel's gift shop allegedly was below market value.

subsequent letters fall into two general categories: (1) communications that relate to the project's cost overruns and possible solutions, namely, capital contributions from the partners and refinancing, and (2) communications that concern appellant's efforts to review the Partnership books and obtain information about the restaurant and other lease arrangements.

In addition to the substantive RICO claim, see 18 U.S.C. § 1962 (c), the amended complaint asserted a RICO conspiracy cause of action, see 18 U.S.C. § 1962(d), as well as claims under Commonwealth law for fraud, breach of contract, breach of fiduciary duty, and violation of the Puerto Rico RICO act.

The district court rejected defendants' argument that the amended complaint lacked the particularity required for fraud claims under Fed. R. Civ. P. 9(b), but it concluded that appellant had not adequately alleged a pattern of racketeering activity. It alternatively ruled that Efron lacked standing to bring the RICO claims either individually or derivatively on behalf of the Partnership. Having dismissed the federal RICO claims, the court declined to exercise supplemental jurisdiction to hear the Commonwealth law claims. On appeal, Efron contends that the court improperly viewed the alleged facts and inferences in the defendants' favor, leading it to conclude wrongly that he had failed to establish the elements of a RICO

violation and conspiracy.  He further maintains that the amended complaint demonstrates his standing, both individually for his unique damages and derivatively for the Partnership.

We turn now to the issue which we deem dispositive – whether the amended complaint described a "pattern" of racketeering activity.  We first sketch the general principles governing RICO claims and then evaluate appellant's specific contentions in light of those standards.

## II. Discussion

To state a RICO claim under section 1962(c), a plaintiff must allege each of the four elements required by the statute: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Feinstein, 942 F.2d at 41 (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).[2]  This case centers on whether Efron alleged sufficient facts to support a jury finding of a "pattern," there being no dispute that the complaint adequately alleged the other components of a RICO violation.  By statute, the "pattern" element requires a

_____

[2] Section 1962(c) provides, in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity .
. . .

plaintiff to show at least two predicate acts of "racketeering activity," which is defined to include violations of specified federal laws, such as the mail and wire fraud statutes, see 18 U.S.C. § 1961(1)(B), (5). Although showing two predicate acts is the only statutory requirement, case law establishes that this is not sufficient to prove a "pattern" – the plaintiff also must demonstrate that the "predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989); see also Feinstein, 942 F.2d at 44.

We have more than once remarked upon the difficulty of articulating concrete guidelines for this "continuity plus relationship" standard for identifying a pattern. See Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 731 (1st Cir. 1996); Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 722 (1st Cir. 1992); see also H.J. Inc., 492 U.S. at 236 ("[D]eveloping a meaningful concept of 'pattern' within the existing statutory framework has proved to be no easy task.").[3] The Supreme Court has noted that the "relationship" portion of

---

[3] The "continuity plus relationship" description was quoted by the Supreme Court in H.J. Inc. from the legislative history of the RICO statute. See 492 U.S. at 239 (quoting 116 Cong. Rec. 18940 (1970)). Justice Scalia in a concurrence in H.J. Inc. termed that formulation "about as helpful . . . as 'life is a fountain.'" Id. at 252 (Scalia, J., concurring).

the standard is easier to grasp, in part because there exists a relevant statutory definition in another portion of the legislation of which RICO was a part. See H.J. Inc., 492 U.S. at 240. Under Title X of the partially repealed Organized Crime Control Act of 1970, the pattern requirement was defined "solely in terms of the relationship of the defendant's criminal acts one to another: '[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. (quoting 18 U.S.C. § 3575(e)). The parties do not dispute the relatedness of the communications at issue here.

The continuity element, which lacks statutory illumination, has proved more puzzling. Noting that it is "difficult to formulate in the abstract any general test for continuity," the Supreme Court in H.J. Inc. nonetheless provided a starting point for analysis. See 492 U.S. at 241-43; Feinstein, 942 F.2d at 45. We previously have summarized the court's guidance as follows:

> For there to be continuity, the plaintiff must show that the related predicates "amounted to, or posed a threat of, continued criminal activity." . . . Under the "amount[ing] to" approach, "[a] party alleging a RICO violation may demonstrate continuity . . . by proving a series of related predicates extending over

> a substantial period of time." H.J., 492 U.S. at 242.
> Because RICO was intended by Congress to apply only to
> enduring criminal conduct, "[p]redicate acts extending
> over a few weeks or months . . . do not satisfy this
> requirement." Id. Under the "threat" approach,
> however, even where the predicate acts occur in a
> narrow time frame and suit is brought before the
> pattern has taken definitive shape, the requirement
> can still be satisfied by . . . a showing that "the
> racketeering acts themselves include a specific threat
> of repetition extending indefinitely into the future
> [or] . . . are part of an ongoing entity's regular way
> of doing business." Id.

Feinstein, 942 F.2d at 45 (some citations omitted).

The Supreme Court thus described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc., 492 U.S. at 241. The Justices also explained in H.J. Inc. that showing a "pattern" does not necessarily require proof of multiple criminal "schemes." Finding that the "multiple-scheme" prerequisite "brings a rigidity to the available methods of proving a pattern that simply is not present in the idea of 'continuity' itself," id. at 240-41, the Court emphasized instead the temporal focus of the "continuity" requirement. Thus, one scheme that extends over a substantial period of time, or that shows signs of extending indefinitely into the future, can establish a pattern.

-10-

In this case, the district court ruled that the allegations in appellant's complaint failed to establish either type of continuity.  After trimming the number of actionable letters and faxes to eight,[4] it held that "[t]he acts are simply too few and the time period too short" to establish a closed period of racketeering activity, <u>see</u> 47 F. Supp.2d at 206,[5] and it concluded that there was no future threat of continuing mail and wire fraud to establish open-ended continuity.  Rejecting appellant's contention that the defendants were engaged in a long-term, ongoing criminal enterprise, it characterized the conflict as a "bitter local law dispute between partners."  <u>Id.</u> at 210 n.11.

Before we address the court's conclusion on the merits, we discuss two preliminary issues.  Efron claims on appeal that the court erred in disregarding the faxes and refusing to consider all of the specified fraudulent mailings. He claims that, under <u>New England Data Servs., Inc.</u> v. <u>Becher</u>, 829 F.2d 286 (1st Cir. 1987), he is entitled to an opportunity to particularize the alleged predicate acts to remedy their deficiencies regarding

[4] The court excluded seven faxes because Efron failed to allege that they had been transmitted interstate and eliminated two mailings as not in furtherance of the alleged scheme.

[5] The court pointed out that, of the viable predicate acts, all but two occurred during a 90-day period from June to September 1997.

when and where the mail or wires were used before his complaint is dismissed. He extends this argument as well to his general allegation that, in addition to the seventeen specifically pleaded communications, there were "literally hundreds of acts" and a "myriad of mail and wire frauds." But in this case, the underlying rationale for relaxation of pleading requirements – that the needed information is likely to be in the exclusive control of the defendant, see id. at 290 – is absent. The gist of Efron's complaint is that he and his non-conspiring partners were defrauded by communications that were sent to them, and such communications would not be in defendants' sole control. Moreover, any need to flesh out allegations in the complaint should have been raised first through a renewed request to conduct discovery and a motion in the district court seeking leave to amend the complaint to cure the infirmities identified by that court. See Feinstein, 942 F.2d at 43-44. Nonetheless, while we consider only those predicate acts specifically alleged in evaluating the adequacy of appellant's "pattern" allegations, see Fleet Credit Corp. v. Sion, 893 F.2d 441, 445 (1st Cir. 1990), we are reluctant in the context of an interstate business to exclude the faxes on the highly technical ground of appellant's failure to plead their interstate quality. We need

not do so because including them will not change the outcome of our review.

A second preliminary issue merits comment. It is whether the pleadings sufficiently indicate that appellant's injuries were caused by the predicate acts of wire and mail fraud. That such a causal nexus must exist is well established. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 266-68 & n.12 (1992) (to state a RICO claim, plaintiff must show injury proximately caused by racketeering activity); Moore v. Painewebber, Inc., 189 F.3d 165, 172 (2d Cir. 1999) (plaintiffs must show that the defendants' misstatements were "the reason the transaction[s] turned out to be . . . losing one[s]" (citation omitted)); Bonilla v. Volvo Car Corp., 150 F.3d 62, 66-67 (1st Cir. 1998) (RICO requires plaintiffs to show that they were "injured in [their] business or property by reason of" the racketeering activity); Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44, 47 (1st Cir. 1991) (to avert dismissal under Rule 12(b)(6), civil RICO complaint must state facts showing "a causal nexus between [racketeering activity] and the harm alleged"; the "injury itself" must be "the result of a predicate act"); cf. Beck v. Prupis, 120 S. Ct. 1608, 1617 (2000) (holding that the injury underlying a RICO conspiracy claim must be caused not by any overt act but by conduct that constitutes

racketeering activity or is otherwise unlawful under the RICO statute).

On the facts, the lack of causation seems to be a significant possibility. Efron entered the partnership before any of the alleged predicate acts occurred, and thus without reliance on any misrepresentations. He asserts that he was coerced into paying $1 million beyond his original contribution to preserve his equity, but he does not allege that he was deceived by the written requests for additional capital. Instead, he describes his "injury-in-fact" as the prospect of a squeezed-down equity position in the partnership, which would have been a by-product of his refusal to contribute all of the requested funds but not necessarily a loss occasioned by misrepresentations or false assurances. In his RICO case statement, Efron suggests that he was the only one of the three victim partners who was <u>not</u> deceived, asserting that the defendants "conducted their misdeeds under unsuspecting eyes, <u>except for Efron</u>." (Emphasis added.)

Despite this seeming weakness in appellant's RICO claim, we are disinclined to rest a judgment on a decision of the causation issue. It was alluded to in appellees' briefs only in a list of pleading requirements, and it was the subject of brief treatment by the parties at oral argument. It is conceivable

that an extremely generous reading of the complaint might allow
the inference that Efron contributed $1 million beyond his
original investment in response to the defendants' written
requests because he initially was deceived into believing there
was a legitimate need for the funds.  In any event, our
disposition makes it unnecessary to explore further the question
of whether the mailings caused a loss to appellant.

We therefore move to the merits and the issue of continuity,
accepting for purposes of our discussion that all seventeen
alleged acts of wire and mail fraud are viable predicate acts
under the RICO statute.  Although the twenty-one month time
frame for these communications meets the Supreme Court's
requirement for closed continuity of more than "a few weeks or
months," H.J. Inc., 492 U.S. at 242, it is not so long a period
nor are there so many predicate acts that other indicators of
continuity – or the lack of them – are without significance.
Cf. Fleet Credit Corp., 893 F.2d at 447 (finding that ninety-
five fraudulent mailings over four and one-half years "is the
type of 'long-term criminal conduct' defined by the [Supreme
Court] as constituting 'continued criminal activity'"); United
States v. Pelullo, 964 F.2d 193, 209 (3d Cir. 1992) ("[M]ost
courts that have found continuity in a closed period did so in

-15-

cases involving periods of several years.")[6]; Hindes v. Castle, 937 F.2d 868, 875 (3d Cir. 1991) (collecting cases ranging from a period of four and one-half to seventeen years).

The Supreme Court in H.J. Inc. noted Congress's "natural and commonsense approach to RICO's pattern element," see 492 U.S. at 237, suggesting that its discussion of temporal factors did not mean that other considerations were to be entirely ignored. Indeed, in rejecting the notion that a pattern of racketeering activity requires proof of multiple schemes, the Court noted that "proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity." Id. at 240. Likewise, where the racketeering activity exceeds in duration the "few weeks or months" that the Supreme Court in H.J. Inc. deemed inadequate, but is neither so extensive in reach nor so far beyond the minimum time period that common sense compels a conclusion of continuity, the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims also

---

[6] Although the court in Pelullo concluded that 19 months was a sufficient period for a finding of continuity, see 964 F.2d at 209, it expressed some doubt that the facts established either open or closed continuity. See id. at 209 n.15, 210. It nonetheless remanded the case for retrial on the RICO count, as well as on multiple wire fraud counts whose reversal was based on evidentiary error.

strikes us as "highly relevant." Cf. Vicom, Inc. v. Harbridge Merchant Servs., 20 F.3d 771, 780 (7th Cir. 1994) (various factors considered in assessing continuity, including the number of victims, the presence of separate schemes, and the occurrence of distinct injuries); Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir. 1993) (considering, in addition to duration, "extensiveness" of the RICO scheme, including number of victims, variety of racketeering acts, whether the injuries caused were distinct, and the complexity and size of the scheme); Pelullo, 964 F.2d at 208 ("We have eschewed the notion that continuity is solely a temporal concept, though duration remains the most significant factor.")[7]; United States Textiles, Inc. v. Anheuser-Busch Co., 911 F.2d 1261, 1269 (7th Cir. 1990) ("'[I]t is not irrelevant, in analyzing the continuity requirement, that there is only one scheme.'" (quoting Sutherland v. O'Malley, 882 F.2d 1196, 1204 (7th Cir. 1989)).

Having considered carefully the various factors here, we have concluded that the allegations do not demonstrate the kind of broad or ongoing criminal behavior at which the RICO statute was aimed. In essence, appellant alleges a scheme to diminish

---

[7] The Third Circuit, en banc, later discussed the continuity requirement at length in a series of opinions. See Tabas v. Tabas, 47 F.3d 1280 (3d Cir. 1995) (en banc). The majority adhered to the view that multiple factors may be relevant in evaluating continuity.

the value of the project in the short run, pressing plaintiff and two others to yield up their interests so that the schemers could own and control the whole project.  Although multiple related acts of deception were claimed to underlay the faxes and mailings, all allegedly were aimed at the single goal of transforming the ownership of the Partnership during its early stages.  See Amended Complaint, ¶ 19 (defendants' goal was "to dilute the interests of the Special Partners and to siphon away Partnership assets" to gain "outright control of the Partnership").  The three named victims were not separately targeted through repetitions of criminal conduct, which could have reflected persistent or broad-based crime; their injury instead resulted from a single set of alleged misdeeds and occurred at the same time.

This narrow attack on three partners' participation in a particular business venture is qualitatively different from the single scheme underlying H.J. Inc.  The plaintiffs there had alleged that telephone company officials and others had engaged in multiple acts of bribery over at least a six-year period to obtain approval for unfairly and unreasonably high rates.  492 U.S. at 250.  Thousands of telephone company customers presumably were injured by the ongoing scheme.

Although a RICO pattern need not have countless victims, the finite nature of the racketeering activities alleged here, together with their occurrence over a relatively modest period of time, cannot, in our view, support a jury finding of a RICO pattern under the "closed" continuity approach.  Our own precedent firmly rejects RICO liability where "the alleged racketeering acts . . . , 'taken together, . . . comprise a single effort' to facilitate a single financial endeavor," Schultz, 94 F.3d at 732; see also Apparel Art, 967 F.2d at 723 ("[A] single criminal episode, or event, is not a 'pattern' . . . [because] its parts, taken together, do not 'amount to or pose a threat of continued criminal activity.'") (quoting H.J. Inc., 492 U.S. at 239).[8]  And, while the cases in this volatile field understandably cannot all be reconciled, we find ourselves in good company.  See, e.g., Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (combination of "single scheme, single injury, and few victims . . . makes it virtually impossible for plaintiffs to state a RICO

---

[8] In Apparel Art, then Chief Judge Breyer noted that the court deliberately used "a vague term like 'episode'" to distinguish the concept of an isolated occurrence from the technical concept of a scheme, as used by the Supreme Court in H.J. Inc.  See 967 F.2d at 722.

claim");[9] Stone, 998 F.2d at 1545 ("Where the scheme has a limited purpose, most courts have found no continuity."); Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir. 1990) (affirming dismissal of RICO claim where a "closed-ended series of predicate acts . . . constituted a single scheme to accomplish 'one discrete goal,' directed at one individual with no potential to extend to other persons or entities" (citation omitted)); Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989) ("Defendants' actions were narrowly directed towards a single fraudulent goal.").

Nor is it reasonable to infer from the allegations here that there is a risk of a broader scheme, or that the fraudulent acts directed at appellant would continue indefinitely into the future, either of which might support a conclusion of "open-ended" continuity. There is nothing to suggest that the defendants would seek to repeat their fraud in other partnerships or similar business settings, or to employ mail and wire fraud indefinitely in the Embassy Suites partnership, thereby showing that racketeering activity might be a "regular way of conducting defendant's ongoing legitimate business . . .

_____

[9] In Alban Towers, the court noted that "[t]he number of alleged predicate acts (fifteen), and the most generous estimate of the length of time the acts continued (three years . . .), are not enough to overwhelm the three narrowing factors." 48 F.3d at 1265.

or of conducting or participating in an ongoing and legitimate RICO 'enterprise,'" <u>H.J. Inc.</u>, 492 U.S. at 243; <u>cf.</u> <u>Roeder</u> v. <u>Alpha Indus., Inc.</u>, 814 F.2d 22, 31 (1st Cir. 1987) ("no suggestion that defendants used similar means to obtain other subcontracts, or that they bribed anyone else").

Viewing the Partnership as either the RICO enterprise or defendants' "ongoing legitimate business," the scenario painted by Efron's pleadings does not threaten the "long-term criminal conduct" with which Congress was concerned, <u>see</u> <u>H.J. Inc.</u>, 492 U.S. at 242. Almost by definition, the alleged fraud had a limited life expectancy. The scheme's objective, as reasonably understood from Efron's not fully consistent allegations,[10] was

_____

[10] In paragraph 19 of the amended complaint and on page 6 of the RICO case statement, for example, Efron describes the defendants' goal to be "gaining outright control of the Partnership." In paragraph 22 of the amended complaint, he alleges that MDC and Rubi made "continual capital calls <u>either</u> to defraud the Special Partners of more money <u>or</u>, alternatively, to try to 'squeeze down' their interests in the Partnership." (Emphasis added.) Paragraph 41, section a, described the first alleged predicate act as a letter sent by Rubi to the special partners concerning cost overruns. Efron alleges: "This was the implementation, carrying out, and continuation of the previously designed scheme to defraud Efron out of additional monies or alternatively to dilute his interest and to deprive him of the full realization of his investment, or all of these." In section r of that paragraph, at the conclusion of the full list of predicate acts, he asserts: "All of the noted predicate acts were meant to defraud, misrepresent, mislead, and to deprive the Special Partners, including Efron, of their ownership interest in the Partnership."

Thus, although the amended complaint and RICO case statement

to squeeze appellant and two co-partners out of the partnership early in its existence so that the remaining partners could reap greater profits through the self-interested operation of this hotel and their other businesses.  See <u>Vicom, Inc.</u>, 20 F.3d at 782 ("[S]chemes which have a clear and terminable goal have a natural ending point . . . [and] therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity.").

It is true that the scheme as alleged already had spanned twenty-one months, and that its exact endpoint could not be ascertained from the pleadings because it depended upon Efron's and the other victim partners' refusal to respond to capital calls large enough to result in squeezing down their interests in the Partnership.  This is far different, however, from the open-ended continuity illustrated by the single scheme described in <u>H.J. Inc.</u>, an endeavor that apparently would have gone on without end had it not been detected.  See 492 U.S. at 250.  Had Efron argued that the defendants planned to operate the hotel

refer to a general goal to defraud Efron and the other victim partners of "more money," the amended complaint read as a whole does not depict this as a long-term objective but simply as a necessary step toward defendants' specific goal of "tak[ng] unrestricted control of the enterprise." <u>See</u> RICO case statement at 7.  His brief and oral argument were framed similarly.  <u>See</u>, <u>e.g.</u>, Brief at 27 ("By their nature, the [defendants'] goals will not be reached, at least until such time as plaintiff loses his entire interest in the partnership.")

-22-

indefinitely at a paper loss as a means of perpetually defrauding him, rather than asserting the specific objective of squeezing him out of the Partnership, he would have a stronger argument for an open-ended RICO pattern. His pleadings and argument, however, depict an undertaking with a soon-to-be reached endpoint. Indeed, Efron's refusal to contribute any more funds and his decision to file suit to protect his interest suggest that the objective was virtually accomplished.

We note that courts, including our own, have suggested that RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it. See, e.g., Schultz, 94 F.3d at 732; Roeder, 814 F.2d at 31. The Seventh Circuit has been explicit in cautioning against finding continuity too easily in the context of a single dishonest undertaking involving mail or wire fraud:

> Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions [under RICO] dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time. Given its "natural and common sense approach to RICO's pattern element," we

-23-

> think it unlikely that Congress intended RICO to apply
> in the absence of a more significant societal threat.

United States Textiles, Inc., 911 F.2d at 1268 (quoting Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 597 (3d Cir. 1990)[11]); cf. Tabas v. Tabas, 47 F.3d 1280, 1290 (3d Cir. 1995) (en banc) ("The inclusion within the scope of civil RICO of [mail and wire fraud], more prevalent in the commercial world than in the world of racketeers, has caused concern that RICO sweeps too broad a swathe."); Menasco, 886 F.2d at 683 ("Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences. . . . The pattern requirement . . . ensure[s] that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value . . . .").

In sum, while the complaint pleads a series of related racketeering acts and permits an inference that defendants defrauded appellant and two of his partners, we agree with the district court's determination that no reasonable jury could

---

[11]In Tabas, 47 F.3d at 1293 n.17, the Third Circuit noted that, to the extent Marshall-Silver could be read to require the existence of a "societal threat" to establish RICO continuity, it is overruled. We deem this narrowing of Marshall-Silver unimportant for present purposes.

find that these allegations establish a RICO "pattern." Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation.

### III. Other issues

Our conclusion that appellant has failed to adequately plead a substantive violation of RICO makes it unnecessary for us to consider his other claims of error. Questions concerning his standing obviously are moot. In addition, his conspiracy claim is without merit. A conspiracy claim under section 1962(d) may survive a factfinder's conclusion that there is insufficient evidence to prove a RICO violation, Howard v. America Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000), petition for cert. filed, 68 U.S.L.W. 3003 (U.S. June 27, 2000) (No. 99-2089), but if the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails, id.; see also Salinas v. United States, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . .").

The judgment of the district court is therefore affirmed.