**EAGLE INVESTMENT SYSTEMS CORPORATION, Plaintiff,**

**v.**

**Einar TAMM and Compendium Research Corporation, Defendants.**

**No. Civ.A. 01–10192–JLT.**

United States District Court, D. Massachusetts.

May 22, 2001.

Craig E. Stewart, Kenneth W. Salinger, Palmer & Dodge, Boston, MA, for plaintiffs.

Robert J. Gilbert, Edward J. Denn, Gilbert & Renton, Andover, MA, for defendants.

### *MEMORANDUM*

TAURO, District Judge.

Plaintiff Eagle Investment Systems Corporation ("Eagle") sues Defendants Einar Tamm and Compendium Research Corporation ("Compendium"), alleging, *inter alia*,[1] violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"),[2] the Federal Wire and Electronic Communications Interception Act ("Wiretap Act"),[3] and the Federal Stored Wire and Electronic Communications Act ("Stored Communications Act")[4]. Before the court is Defendants' Motion to dismiss Plaintiff's RICO and Wiretap Act claims.

### *BACKGROUND*

Eagle designs, develops, and sells software for the financial-services industry. Eagle contracted with a temporary-placement agency, New Boston Systems, Inc., to retain skilled employees. As part of the Service Agreement (the "Agreement") between the companies, New Boston referred Defendant Tamm in 1996 to work as a staff programmer for Eagle's EagleSTAR ™ product.

Under the Agreement, Eagle paid New Boston directly for Tamm's services. The Agreement also provided that "all intellectual property rights" in any work created by Tamm for Eagle "shall be the sole property of [Eagle] without any additional compensation to [Tamm]," [5] and that Tamm "expressly assigns all rights (including, without limitation, patent rights and copyrights) in such inventions, works of authorship, and the like to [Eagle]." [6]

Tamm's affiliation with New Boston expired in June 1997. He offered to continue working for Eagle under the terms of the Agreement if Eagle paid Tamm's company, Compendium, for his services. Eagle agreed.

On June 29, 1997, Tamm allegedly submitted an invoice on personal letterhead asking Eagle for $38,000 to compensate him for 67 days of custom-software-code-programming work. Eagle refused, citing the Agreement. Tamm made a duplicate demand on April 27, 2000 in a letter to Eagle from himself and Compendium.

On October 17, 2000, Tamm spoke to Eagle's Comptroller about the $38,000 demand. Tamm stated that the money was a licensing fee for each EagleSTAR ™ software license negotiated by Eagle and its customers. During the conversation, Tamm allegedly demanded "a generous plan of cash and/or stock options," and threatened to "have the marshals come get the software" if Eagle failed to comply.[7] Eagle terminated Tamm on October 23, 2000.

Tamm allegedly sent Eagle's Chief Financial Officer an email message on January 4, 2001, again demanding the $38,000 "licensing fee." The following day, Tamm spoke to Eagle's CFO and claimed that he had a written licensing agreement that entitled him to the money.

---

1. Plaintiff also alleges numerous state-law violations, including unfair and deceptive trade practices, misappropriation of trade secrets, conversion, and breach of contract.

2. 18 U.S.C. §§ 1961–68 (2000).

3. *See id.* at §§ 2510–22.

4. *See id.* at §§ 2701–11.

5. Compl. at ¶ 11.

6. *Id.*

7. *Id.* at ¶ 20.

On January 17, 2001, Tamm and Compendium sent, via Federal Express, a letter that referenced the $38,000 and demanded $1,368,000. The letter stated Defendants were owed this amount under the purported licensing agreement. A copy of this agreement and a copy of an October 17, 2000 email sent by Eagle's Comptroller to the company's President and CFO were attached to the letter.

Tamm allegedly emailed Eagle's CFO five days later, stating "I assume you got the fedex package last week. What time on [Tuesday] works?"[8] When the CFO responded that he needed to review the demand, Tamm replied that Eagle now owed him "$1.3–4.4 million," and "strongly urge[d] [Eagle] to find time in the next day or so to pay that past due invoice."[9]

Tamm sent another email on January 23, 2001, where he asked for a $1–4 million payment "in a prompt manner."[10] On January 25, 2001, Tamm sent an email to Eagle's President, stating that he knew Eagle would file a lawsuit, and demanded a settlement offer by the next morning. Tamm forwarded a copy of this email to Eagle's counsel.

The same day, Tamm and Compendium allegedly sent, by Federal Express, a revised letter to Eagle's CFO, this time demanding $2,318,000. Attached were copies of the licensing agreement; Eagle's January 18, 2001 Board–Meeting Agenda; a January 15, 2001 Sales–Activity Report; and the January 12, 2001 Sales Statements. Eagle alleges that Tamm stole these confidential materials and the October 17, 2000 email.

## DISCUSSION

Defendants Tamm and Compendium move to dismiss Eagle's RICO and Wiretap Act claims. When ruling on a Motion to Dismiss, this court accepts as true all factual allegations and draws all reasonable inferences in the nonmovant's favor.[11] The court will only dismiss claims where no set of alleged facts would entitle the plaintiff to relief.[12]

## I. RICO Claim

■ To state a RICO claim, Plaintiff must allege that: (1) the defendant is involved in an enterprise; (2) engaged in a pattern; (3) of racketeering activity; (4) that injures the plaintiff.[13] Defendants only contest the pattern and injury elements.

### A. Pattern

■ A "pattern" is two or more "related" predicate acts of "racketeering activity," that "amount to or pose a threat of continued criminal activity."[14] Predicate acts are specific federal law violations, including mail and wire fraud.[15]

Plaintiff specifically alleges two predicate acts of mail fraud: (1) the demand letter sent via Federal Express from Defendants to Plaintiff on January 17, 2001; and (2) the demand letter sent via Federal Express from Defendants to Plaintiff on January 25, 2001. Plaintiff, in its brief,

8. *Id.* at ¶ 35.

9. *Id.* at ¶ 36.

10. *Id.* at ¶ 37.

11. *See* Fed.R.Civ.P. 12(b)(6); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988).

12. *See Gooley*, 851 F.2d at 515.

13. *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 37 (1st Cir.1991).

14. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see* 18 U.S.C. § 1961(1)(B).

15. *See* 18 U.S.C. § 1961(1)(B).

also contends that the "stolen" October 17, 2000 email message and the "stolen" corporate records are predicate acts. Defendants concede that the alleged acts are related. The only issue then is whether they amounted to or posed a threat of continued criminal activity.

### 1. Amounted-to Continuity

■ Under the amounted-to approach, also considered the closed approach, Plaintiff must show that the related predicate acts extended over a substantial period of time.[16] But "predicate acts extending over a few weeks or months ... do not satisfy this requirement." [17]

■ Three of the alleged acts occurred from January 15–25, 2001. The remaining act of stealing the email message occurred sometime between October 17, 2000 and January 17, 2001. Because three of the four acts occurred in under two weeks, with the remaining act occurring within three months, the predicate acts did not continue for a substantial period of time and, therefore, do not amount to continued criminal activity.[18]

### 2. Threat-of Continuity

■ Under the threat-of or open approach, a plaintiff may still show continuity when the predicate acts occur in a narrow time frame,[19] if it can demonstrate that

"the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] ... are part of an ongoing entity's regular way of doing business." [20] Plaintiff here alleges four acts, all of which shared the common goal of forcing Plaintiff to pay for work allegedly performed and licensed by Defendants.

The First Circuit, in *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (2000) noted that a scheme with a terminable goal or natural ending point does not constitute threatened or open-ended continuity.[21] In *Efron*, the plaintiff, a limited partner in a hotel project, sued the other partners under RICO alleging that they intentionally caused the project to lose money, so they could squeeze him out of the partnership and reap greater profits.[22] The plaintiff averred seventeen predicate acts of wire and mail fraud occurring over twenty-one months.[23]

The First Circuit held that the alleged scheme had a "limited life expectancy," which prevented the plaintiff from showing the threat of long-term criminal conduct.[24] The court noted that, although the exact endpoint of the scheme could not be ascertained, the pleadings demonstrated "an undertaking with a soon-to-be-reached endpoint." [25] Once the plaintiff relinquished his partnership interest, the scheme would

---

**16.** *See H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

**17.** *Id.*

**18.** *Compare Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 19 (1st Cir.2000) (concluding that where the acts related to a single scheme, twenty-one months is insufficient to find closed continuity).

**19.** *See Feinstein*, 942 F.2d at 45.

**20.** *See H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

**21.** *See* 223 F.3d at 20 (citing *Vicom Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 782 (7th Cir.1994)).

**22.** *See id.* at 13.

**23.** *See id.* at 13–14.

**24.** *Id.* at 19.

**25.** *Id.* at 20.

end. "Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners [which] cannot be a RICO violation." [26]

As in *Efron*, Plaintiff here pleads a common scheme with a single, terminable goal. Once Plaintiff paid Defendants as demanded, the alleged extortionate scheme would end. Plaintiff, therefore, fails to allege facts from which this court can infer that Defendants were engaged in a broader scheme or that the fraudulent acts would continue indefinitely.

### B. Injury

■ Although unnecessary to the court's decision on the pending Motion to Dismiss, the court considers Defendants' final argument that Plaintiff fails to allege causal injury. Plaintiff argues that its costs in bringing this litigation constitute RICO injury. To be actionable, the alleged RICO injury must be caused by the predicate acts,[27] and be of the sort intended by the defendants[28]. Litigation costs alone, therefore, can constitute RICO injury, but only when they are the intended consequence of the defendant's racketeering activities.[29]

■ Plaintiff states in its brief to this court that Defendants intended to "either force Eagle to relinquish its legal right to defend itself from fraudulent claims or incur excessive costs in vindicating this right."[30] Because Plaintiff alleges that litigation costs were an intended consequence of the predicate acts, that element of Plaintiff's RICO claim would be satisfied.

## II. Wiretap–Act Claim

■ Plaintiff claims that Defendants violated the Wiretap Act when they acquired the October 17, 2000 email after it was sent by Eagle's Comptroller to the company's President and CFO. Defendants move to dismiss on the ground that the Wiretap Act only prohibits the unauthorized interception of electronic communication during transmission. Plaintiff argues, however, that amendments to the Wiretap Act eliminated the during-transmission requirement. The Circuits are split on this issue, and the First Circuit has yet to weigh in.[31]

The Wiretap Act was enacted in 1968 to prohibit the unauthorized interception of wire and oral communications.[32] The Act defined "wire communications" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of

**26.** *Id.* at 21.

**27.** *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496–97, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

**28.** *See Lemelson v. Wang Lab., Inc.,* 874 F.Supp. 430, 433 (D.Mass.1994) (citing, *inter alia, Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1167 (2d Cir.1993)).

**29.** *See id.*

**30.** (Pl.'s Mem. Opp. Mot. to Dismiss at 8.)

**31.** Although the First Circuit has not considered the issue, a district court within the Circuit has. In *United States v. Moriarty*, Senior District Judge Freedman adopted a Magistrate Judge's Report and Recommendation that held the Electronic Communications Privacy Act of 1986 did not eliminate the requirement that the acquisition occur during-transmission for an interception to occur. *See* 962 F.Supp. 217 (D.Mass.1997). Judge Freedman adopted the Report and Recommendation without analysis because "No objections [were] filed." *Id.* at 217.

**32.** 18 U.S.C. § 2511(a) (1970).

wire, cable or other connection." [33]  Intercept was the "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." [34]  Courts construed this statutory definition to require that the aural acquisition occur contemporaneously with transmission.[35]  Unless the acquisition occurred during-transmission, no Wiretap Act violation could occur.

The Electronic Communications Privacy Act of 1986 ("ECPA") [36] amended the Wiretap Act and created a separate Act for stored communications.  Title I of the ECPA added "electronic communication" to the Wiretap–Act offense, making it unlawful to "intentionally intercept... electronic communication." [37]  It also added "electronic communication" to the definition of "intercept," expanding it to include the acquisition of the contents of any electronic communication.[38]  "Electronic communication" includes "any transfer of signs, signals, writing, images, sounds," etc.[39]  Title II of the ECPA is the Stored Communications Act, a statute that prohibits the unauthorized access to "electronic communication while it is in electronic storage." [40]

Defendants' dismissal argument raises an issue unaddressed by the First Circuit: whether the ECPA eliminated the Wiretap–Act requirement that the acquisition occur "during transmission."  Recognizing the existing circuit split, Defendants argue that this court should follow the Fifth Circuit's reasoning in *Steve Jackson Games Inc. v. United States Secret Serv.*[41]

In *Steve Jackson,* the plaintiff sued the Secret Service for acquiring unread private email, stored on an electronic bulletin board system.  The Fifth Circuit held that the plaintiff failed to state a Wiretap–Act claim because the acquisition did not occur "during transmission."  In ruling that the ECPA did not eliminate the during-transmission requirement, the court noted that Congress did not include electronic storage in the statutory definition of "electronic communication."  The court further considered Title II of the ECPA, the Stored Communications Act, which proscribes the unauthorized access to stored electronic communications.  The Fifth Circuit was persuaded that by prohibiting the unauthorized access to stored electronic communications in Title II, Congress did not intend to duplicate the same civil remedy under Title I.[42]

Plaintiff, on the other hand, argues that the Ninth Circuit's decision in *Konop v. Hawaiian Airlines, Inc.*[43] is more persuasive.  There, the plaintiff owned a secure website where he posted bulletins critical of the airline.  To access the website, the plaintiff required visitors to log on using their user names and passwords.  But to obtain the user name and password, visitors had to register and consent not to disclose the website's contents.  The plaintiff sued the airline after learning that an airline vice president obtained repeated ac-

---

**33.**  *See id.* at § 2510(1).

**34.**  *See id.* at § 2510(4).

**35.**  *See United States v. Turk,* 526 F.2d 654, 658 (5th Cir.1976).

**36.**  Pub.L. No. 99–508, 100 Stat. 1848.

**37.**  *See* 18 U.S.C. § 2511(1)(a).

**38.**  *See id.* at § 2510(4).

**39.**  *Id.* at § 2510(12).

**40.**  *Id.* at § 2701.

**41.**  *See* 36 F.3d 457 (5th Cir.1994).

**42.**  *See id.* at 463–64.

**43.**  *See* 236 F.3d 1035 (9th Cir.2001).

cess to the site by using the user names and passwords of airline employees.

The Ninth Circuit held that the airline's conduct constituted an unlawful interception under the amended Wiretap Act, even though the airline vice president did not access the secure information during transmission, i.e. when the sender or website owner downloaded the communication onto the website.[44] The Ninth Circuit closely considered the statutory definition of "electronic communication" in rendering its decision, noting that the definition excludes certain kinds of stored information, such as electronic-funds-transfer information stored by financial institutions. Because certain stored information is excluded, the court determined that Congress understood that electronic communication, in ordinary circumstances, includes stored communications.[45]

Upon review of these decisions and others considering the issue,[46] this court concludes that the ECPA did not eliminate the during-transmission requirement from the Wiretap Act. The statutory definitions are critical. The ECPA added "electronic communication" to the definition of "intercept." Congress defined "electronic communication" to be the *"transfer* of signs, signals, writing," etc.[47] If Congress intended electronic communication to include both transfer and storage, it easily could

have included the word "storage" in the definition.

Moreover, the ECPA as a whole supports this conclusion.[48] Title II, the Stored Communications Act, makes it unlawful for an unauthorized person to access stored electronic communication.[49] Plaintiff contends that Congress intended the ECPA to eliminate the during-transmission requirement from the Wiretap Act, thereby providing the same causes of action under both the Wiretap and Stored Communications Acts. This argument is highly unpersuasive. If Congress intended to provide duplicate remedies for the same offense, it could have—and logically would have—evidenced that purpose in the definition of "electronic communication." To read otherwise would prevent "the Wiretap Act and the Stored Communications Act [from coexisting] peacefully."[50]

Finally, this court's holding comports with the common meaning of "intercept." According to the Oxford English Dictionary, "intercept" means "to seize, catch, or carry off … on the way from one place to another; to cut off from the destination aimed at."[51] The common meaning of intercept then requires the electronic communication to be acquired before it reaches its intended destination, i.e. during its transmission.

Plaintiff alleges that Defendants acquired the October 17, 2000 email after it

---

44. *See id.* at 1048.

45. *See id.* at 1045–46.

46. *See e.g. United States v. Moriarty,* 962 F.Supp. 217 (D.Mass.1997); *Fraser v. Nationwide Mut. Ins. Co.,* 135 F.Supp.2d 623 (E.D.Pa.2001); *Wesley College v. Pitts,* 974 F.Supp. 375 (D.Del.1997); *Bohach v. City of Reno,* 932 F.Supp. 1232, 1236–37 (D.Nev. 1996).

47. 18 U.S.C. § 2510(12) (emphasis added).

48. *See Steve Jackson,* 36 F.3d at 462 (stating that when construing a statute, the court need not confine its interpretation to the provision at issue, but considers the statute as a whole).

49. *Id.* at § 2701(a).

50. *Smith,* 155 F.3d at 1059.

51. http://dictionary.oed. com/cgi/entry/00118823?query_ type=word & queryword=intercept & sort_type=alpha & edition=2e & first=1 & max_to_show=10 & search_id=bx06–FowHRu–5601.

had been sent by Eagle's Comptroller and received by its intended recipients, the company's President and CFO. Because the acquisition occurred after—not during—transmission, Plaintiff fails to state facts to support a Wiretap–Act violation.

## *CONCLUSION*

Accepting as true all factual allegations and drawing all reasonable inferences in Plaintiff's favor, Plaintiff fails to plead facts that demonstrate a pattern of racketeering activity, as required under RICO. Plaintiff also cannot show that the email acquisition occurred during transmission, an essential element of a Wiretap–Act claim. Defendant's Motion to Dismiss Plaintiff's RICO and Wiretap–Act claims, therefore, is ALLOWED.

ORDER WILL ISSUE.