WESTERN ASSOCIATES LIMITED PARTNERSHIP, individually and on behalf of Avenue Associates Limited Partnership, Appellant,

v.

MARKET SQUARE ASSOCIATES, et al., Appellees.

No. 00–7021.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 28, 2000.

Decided Jan. 5, 2001.

Barry Wm. Levine argued the cause for appellant. With him on the briefs was Richard J. Conway.

Paul B. Gaffney argued the cause for appellees. With him on the brief were Paul Martin Wolff, Joseph B. Tompkins, Jr., and Christine Liverzani Prame. James D. Miller, Michael R. Smith and Peter M. Todaro entered appearances.

Before: HENDERSON, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In this appeal the court again addresses the continuity prong of the "pattern of racketeering activity" requirement of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. Western Associates Limited Partnership ("Western") sued various individuals and investors associated with Market Square Associates (collectively, "Market"), its partner in the development of a real estate project known as Market Square. Western alleged violations under RICO and District of Columbia law based on an accounting dispute in the partnership. The district court, applying the multi-factor analysis of *Edmondson & Gallagher v. Alban Towers Tenants Association*, 48 F.3d 1260 (D.C.Cir.1995), dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(6) because Western failed to allege the requisite pattern of racketeering activity.[1] Western contends that in finding the "continuity" element lacking, the district court erred by failing to focus on the length of the time period during which Market's predicate acts occurred, and misread *Edmondson*. We disagree, and accordingly we affirm.

### I.

Market Square is a mixed-use property in downtown Washington, D.C. that consists of office and retail space and residential condominium units. In 1985, Western, a District of Columbia limited partnership, formed Avenue Associates Limited Partnership ("Avenue Associates") to "develop, own, manage, and ultimately dispose of the Market Square Project." In 1987, Western invited Market Square Associates, a Washington, D.C. general partnership, to join Avenue Associates. Upon completion of the construction of the project, Western held a 30 percent limited partnership interest, and Market Square Associates owned a 67.5 percent limited partnership interest and a 2.5 percent general partnership interest.

In October 1997, Western filed suit in the United States District Court for the District of Columbia, alleging that beginning in 1988 and continuing for more than eight years thereafter, Market repeatedly violated partnership agreements, transmitted fraudulent accounting statements, and stole the value of Western's partnership interest. At the heart of the alleged fraud are alleged misrepresentations of expected costs and profits that Market made in budget projections for the Market Square project. According to the complaint, after Western was deceived into approving a fraudulent budget in 1989, Market covered up its misrepresentations by exaggerating the economic viability of the project in annual financial statements. Western alleged that Market also violated the terms of the partnership agreement regarding the priority of cash flow distribution by improperly favoring itself over Western for cash flow disbursements, and caused the partnership to repay loans for cost overruns that Market alone was responsible for repaying. Western asserted that as a result of Market's violations of the RICO Act, Western had suffered over $89 million in damages.[2]

The following month, in November 1997, Western filed for an injunction to prevent Market from transferring some of its interests in the Market Square Project. Relying on *Edmondson*, the district court denied the request for an injunction, ruling that because Western had alleged a single scheme, a single discrete injury, and a single victim, Western had not demonstrated the requisite "pattern of racketeering activity" under § 1961(5) of the RICO Act, and thus, was unlikely to succeed on the merits.

Subsequently, Western filed an amended complaint, increasing the number of

---

1. After dismissing the RICO claims, the district court dismissed the remaining claims for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1367(c)(3).

2. Under RICO's civil provisions, treble damages may be sought by "any person injured in his business or property," 18 U.S.C. § 1964(c), by one or more of four types of "prohibited activities," which are defined in 18 U.S.C. § 1962.

schemes and victims alleged. The amended complaint alleges that Market conspired to commit and engaged in four separate but related schemes to defraud Avenue Associates, Western, and the general and limited partners that make up Western. The four schemes consist of: (1) the Revised Budget–Approval Scheme; (2) the Cost–Shifting Scheme; (3) the Income Projection Scheme; and (4) the Going–Concern Scheme.

The four alleged schemes are briefly summarized as follows. (1) The Revised Budget–Approval Scheme was a plot to conceal cost overruns. According to the complaint, Market knew as early as April 1988 that the total cost of the project would exceed the original budget, and improperly approved and conspired to conceal cost increases. In August 1989, after 18 months, Market sent a revised budget to Western, knowing that the cost projections in this budget were also inaccurate. Western relied on the false representations in the revised budget and approved it in December 1989. (2) The Cost–Shifting Scheme addresses the priority of allocations and the continuing cost increases. The partnership's budgets called for costs to be divided into "guaranteed" and "non-guaranteed" categories, and prohibited guaranteed cost overruns from being repaid from partnership cash flow. According to the complaint, Market circumvented these accounting restrictions by shifting guaranteed cost items into the non-guaranteed category, used improperly authorized optional loans to cover these cost increases, and repaid these loans out of partnership distributions. This fraudulent scheme was concealed by annual financial statements mailed to Western each year between 1990 and 1996. (3) The Income Projection Scheme arises from Market's attempt to conceal the impact of the budget overruns. According to the complaint, in 1992, in a series of financial documents, Market falsely represented the expected revenues from Market Square over the next 15 years, overstated the value the cost increases had added to the project,

and deceived Western regarding the partnership's debt. Due to these misrepresentations, Western refrained from suing appellees or pursuing other remedies. (4) The Going–Concern Scheme relates to a failure to provide honest annual accounting statements. The complaint alleges that from 1994 to 1996, Market sent Western financial statements that omitted a "going-concern clause," in an effort to conceal Avenue Associates' burdensome debt.

According to the amended complaint, Western did not become aware that the Market Square Project's financial health was in jeopardy until early 1997, when it received a financial statement indicating that the partnership was having difficulty meeting its financial obligations. This statement also acknowledged that Market Square would not meet Market's 1992 income projections. The amended complaint alleged that the four schemes included numerous violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and that these allegedly fraudulent acts violated § 1962(c) of the RICO Act. Western also alleged a violation of § 1962(d) of the RICO Act, which prohibits conspiracy to violate § 1962(c). Finally, Western alleged common law claims of fraud, civil conspiracy to defraud, breach of fiduciary duty, aiding and abetting a fiduciary, and breach of contract, and requested various types of injunctive relief, including access to the records of Avenue Associates.

The district court granted Market's motion to. dismiss under Fed.R.Civ.P. 12(b)(6), based on Western's failure to allege a "pattern of racketeering activity," as required by § 1961(5) of the RICO Act. Relying on similarities to *Edmondson*, 48 F.3d 1260, the district court found Western's RICO claims deficient because Western had alleged a single fraudulent scheme, the single harm of a diminished partnership interest, and, at most, one set of victims. The district court rejected Western's argument that because it had

alleged fraudulent acts over an eight-year period of time, it had successfully distinguished *Edmondson* and established a pattern of racketeering activity.

## II.

On appeal, Western contends that the district court misapplied *Edmondson* and overlooked the importance of the eight-year time period during which the alleged fraud occurred. Our review of the district court's order dismissing the complaint is *de novo*. The court assumes that the factual allegations in the complaint are true, but it is not bound by the complaint's legal conclusions. *See Whitacre v. Davey*, 890 F.2d 1168, 1168 n. 1 (D.C.Cir.1989).

A violation of § 1962(c) of the RICO Act consists of four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C.Cir.1991) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The RICO Act defines the term "pattern of racketeering activity" as requiring the commission of at least two predicate racketeering offenses over a ten year period. *See* 18 U.S.C. § 1961(5). These predicate offenses are acts punishable under certain state and federal criminal laws, including mail and wire fraud. *See* 18 U.S.C. § 1961(1)(B).

The Supreme Court has interpreted the pattern requirement to include two additional elements: relatedness and continuity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "To prove a pattern of racketeering a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* The Court further described the relatedness element as criminal acts that share "similar purposes, results, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *Id.* at 240, 109 S.Ct. 2893. Continuity, the most relevant prong in the instant case, may be proved by establishing either a "closed period of repeated conduct" or a threat of future criminal activity. *Id.* at 241, 109 S.Ct. 2893. Western alleged a closed period of continuous criminal activity between 1988 and 1997.

The Supreme Court in *H.J. Inc.* suggested that the relatedness and continuity concepts required further development in subsequent cases, and urged a "natural and commonsense approach to RICO's pattern element." *Id.* at 237, 109 S.Ct. 2893. In *Edmondson*, this court provided more guidance on the nebulous issue of what constitutes a pattern of racketeering activity. *Edmondson* involved a real estate developer that accused a tenants' association of illegally attempting to block the sale of the building in which members of the tenants' association lived. *See Edmondson*, 48 F.3d at 1263–64. The real estate developer alleged that the tenants had "exploited [a] quiet-title action, holding the building sale hostage and thereby attempting to force [the developer] to pay them off." *Id.* Based on predicate acts such as extortion, bribery, and perjury, the developer asserted that the association had violated RICO. The court affirmed the dismissal of the RICO claims because "the single scheme alleged—designed to frustrate one transaction and inflicting a single, discrete injury on a small number of victims—fail[ed] to meet RICO's requirement of a 'pattern of racketeering activity.'" *Id.* at 1263.

*Edmondson* identified six factors that a court should consider "in deciding whether a [RICO] pattern has been established." *Id.* at 1265. These factors are: "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Id.* (quoting *Kehr Packages, Inc. v. Fidelcor,*

*Inc.*, 926 F.2d 1406, 1411–13 (3d Cir.1991)) (internal quotation marks omitted). *Edmondson* does not establish a rigid test, but rather presents a flexible guide for analyzing RICO allegations on a case by case basis. The court in *Edmondson* acknowledged that in some cases "some factors will weigh so strongly in one direction as to be dispositive." *Id.* The court also indicated that if a plaintiff alleges only a single scheme, a single injury, and few victims it is "virtually impossible for plaintiffs to state a RICO claim." *Id.*

Analyzing the allegations of the amended complaint through the six-factor lens of *Edmondson* inexorably leads to the conclusion that Western failed to state a legally cognizable claim under RICO. *Edmondson* provides a compelling analogy because Western has alleged only a single scheme, a single injury, and a single victim (or single set of victims). Thus, Western has failed to satisfy the continuity prong of RICO's "pattern of racketeering activity" requirement.

The district court properly rejected Western's notion that numerous schemes to defraud were perpetrated by Market. "The court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). As the district court found, Market's conduct is more accurately characterized as a single effort to diminish the value of Western's partnership interest, primarily by concealing cost overruns or shifting the burden of financing them. Indeed, Western's four-scheme division appears specious on its face. Comparing the amended complaint with the original complaint further demonstrates that Western's four purported schemes are merely a cosmetic disguise of a single scheme. The amended complaint simply subdivides Western's initial allegations. Despite Western's protests that the court must focus on its amended complaint, it is appropriate for the court to look beyond the amended complaint to the record, which includes the original complaint. *See Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C.Cir.1979); 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed.1990). Thus, the district court properly observed not only that the amended complaint merely "dress[ed] up the old [complaint] with ... boilerplate RICO verbiage," but also that "W[estern] appears to have distorted the allegations against [Market] to create the appearance of multiple injuries to multiple victims in an apparent effort to satisfy the statutory language of RICO."

It is true that depending on the specific circumstances a single scheme may suffice for purposes of RICO. The Supreme Court in *H.J. Inc.* rejected the idea that multiple schemes must be proved to establish a pattern of racketeering activity. *See H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893. Our holding in *Edmondson* is not to the contrary. *See Edmondson*, 48 F.3d at 1265. The Supreme Court also emphasized that the concept of a racketeering "scheme" does not appear in the RICO statute, and indicated that it should be applied with caution because it is amorphous, highly elastic, and subject to "the level of generality at which criminal activity is viewed." *H.J. Inc.*, 492 U.S. at 241 n. 3, 109 S.Ct. 2893. However, the number of schemes alleged remains a useful consideration. For example, the Supreme Court in *H.J. Inc.* stated that "proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity." *Id.* at 240, 109 S.Ct. 2893. Although the definition of "scheme" is imprecise, this court can help to clarify how this term should be understood by providing examples and by indicating "what lies

beyond [its] conceptual scope." *Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 722 (1st Cir.1992).

The instant case serves as an example of a vain attempt to make a RICO claim seem more viable by parsing one scheme into multiple schemes. *See Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir.1990). Western's subdivision of Market's alleged fraudulent activity is unavailing because the four schemes are so similar in nature and purpose (i.e., they involve contested bookkeeping entries), and they resulted in a single harm rather than separate injuries. *See supra* p. 632. For the term "scheme" to retain any utility, it cannot be so easily invoked that it allows such closely related accounting misrepresentations involving a single project to be considered distinct schemes. Under Western's interpretation of what constitutes a scheme, almost any fraudulent act could be subdivided to establish a RICO claim. *Cf. Apparel Art,* 967 F.2d at 722–23.

Western's allegations of multiple victims are dubious for similar reasons. By alleging harm to each individual member of its partnership, Western has again artificially subdivided an aspect of its allegations in a transparent effort to make Market's alleged fraudulent conduct seem more expansive. For the purposes of RICO pattern analysis, this set of victims should be viewed as a single victim. The district court correctly noted that if "W[estern] was injured then naturally those who have a financial interest in [Western] may be affected." To the extent that Western's partners were injured, they were injured indirectly, which does not make them individual victims under RICO. *Cf. Wade v. Hopper,* 993 F.2d 1246, 1250 (7th Cir.), *cert. denied,* 510 U.S. 868, 114 S.Ct. 193, 126 L.Ed.2d 151 (1993). For example, in *Wade,* the court affirmed the dismissal of a RICO claim brought by shareholders against alleged looters of a corporation, because the shareholders sued individually, and not on the corporation's behalf. *See id.* The court held that the RICO claim

belonged only to the corporation, and thus the shareholders were not the "proper parties to bring a RICO claim for harm done to [the corporation]." *Id.* The court also faulted the plaintiff-appellants for failing to "describe how they were directly and personally injured by the alleged RICO violations." *Id.*

Furthermore, the concept of a single set of victims is distinct from a class of victims who are all similarly and directly injured, and who should *not* be considered to be a single victim. For example, in *H.J. Inc.* the class of victims was thousands of customers who were each directly injured by a telephone company accused of charging unreasonable rates. Similarly, the single injury to Western was its diminished partnership interest, and Western does not appear to have alleged multiple injuries.

Consequently, Western can meet the RICO pattern requirement only if it is able to effectively distinguish *Edmondson.* Western's primary contention in that regard focuses on the length of time during which Market mailed and faxed alleged financial misrepresentations. The amended complaint alleges dozens of predicate acts extending continually over an eight-year period, in contrast with *Edmondson,* where the predicate acts extended only over three years, with most of the acts occurring in a one-month period. Western relies on the Supreme Court's statement that "continuity is centrally a temporal concept," *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893, in maintaining that the time difference between the two fact patterns is sufficient to establish a dispositive difference. According to Western, the district court misinterpreted *Edmondson* by not regarding the length of time over which the predicate acts occurred as the most important factor in its analysis.

This line of reasoning is unpersuasive for at least two reasons: it distorts both Supreme Court and D.C. Circuit precedent. First, Western misinterprets *H.J. Inc.* to the extent that it claims that time is such an important factor that an eight-

year span must create a viable RICO action. As the district court explained, "[t]he mere longevity of a scheme or schemes does not necessarily mean that a 'pattern of racketeering activity' is present." *H.J. Inc.* requires that predicate acts be committed over a period longer than "a few weeks or months," but an eight-year time period, though highly relevant, is not dispositive. Even if temporal length was supposed to be the most heavily weighted factor in the multi-faceted *Edmondson* analysis (an assumption that is not necessarily mandated by *H.J. Inc.*), it may be trumped by other factors of the *Edmondson* analysis. Although *H.J. Inc.* stresses that RICO is directed towards "long-term criminal conduct," *id.*, it also makes plain that a pattern can be defined with "reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *Id.* at 239, 109 S.Ct. 2893.

Second, Western misreads *Edmondson* to stand for the proposition that "sporadic criminal activity ... does not satisfy *H.J. Inc.*'s mandate that predicate acts occur over a substantial period of time." Although the court took temporal length into account in *Edmondson,* its rationale relied more on three other factors: "single scheme, single injury, and few victims." *Edmondson,* 48 F.3d at 1265. Instead of concluding that the predicate acts were too sporadic, the court stated in *Edmondson* that even an assumption that the acts were committed over a three year time period could not salvage the plaintiff's RICO claims. *See id.*

Finally, not to be overlooked is the character of the alleged racketeering activity. The amended complaint describes a business dispute about cost and income projections, and the priority of allocations, rather than a wide-ranging series of extensive criminal schemes. Market's conduct can basically be characterized as beginning with fraudulent budget underestimates, with the subsequent predicate acts serving as attempts to cover up or shift the debt burden caused by cost overruns. Additionally, many of the predicate acts consist of mailings of annual financial reporting statements that Market was ostensibly obligated to provide to Western. Because most of the predicate acts were mailings or faxes that relate back to an initial misrepresentation, and because the parties' dispute appears to be more in the nature of an ordinary business deal gone sour, the activity encompassed by Western's amended complaint is similar to that in *Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 21 (1st Cir.2000), where the First Circuit recently affirmed the dismissal of a RICO claim. In *Efron,* a real estate deal disintegrated into a bitter dispute between partners, and one partner alleged that he had been defrauded by financial misrepresentations in mailings and faxes. Affirming the dismissal of RICO claims, the First Circuit held that "[t]aken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation." *See id.* at 21.

We recognize that the Supreme Court has interpreted the RICO Act broadly, to include many "garden-variety fraud and breach of contract cases" that might best be prosecuted under state rather than federal law. *Sedima,* 473 U.S. at 525, 105 S.Ct. 3275 (Powell, J., dissenting). The Court has acknowledged that "[i]nstead of being used against mobsters and organized criminals, RICO has become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Sedima,* 473 U.S. at 499, 105 S.Ct. 3275. In the absence of congressional action to narrow RICO's scope, the Supreme Court has refused to countenance procedural limitations crafted by the courts of appeals, and has refused to limit RICO to organized crime, or to organizations rather than individuals. *See H.J. Inc.,* 492 U.S. at 244, 109 S.Ct. 2893.

Nevertheless, we do not understand the Supreme Court to disparage in-

terpreting RICO's pattern requirement to guard "against finding continuity too easily in the context of a single dishonest undertaking involving mail or wire fraud." *See Efron,* 223 F.3d at 20. As other circuits have observed, "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* This caution stems from the fact that "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al–Abood ex rel. Al–Abood v. El–Shamari,* 217 F.3d 225, 238 (4th Cir.2000); *see also United States Textiles, Inc. v. Anheuser–Busch Cos., Inc.,* 911 F.2d 1261, 1268 (7th Cir.1990); cf. *Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.1995) (en banc). Although a RICO claim may be based only on predicate acts consisting exclusively of mail and wire fraud, scrutiny of such claims is necessary, and not inconsistent with the breadth of RICO. The pattern requirement thus helps to prevent ordinary business disputes from becoming viable RICO claims, with defendants subject to treble damages, simply because the parties used the United States mails or a fax machine to transmit contested financial documents. Thus, in *Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989), the Fourth Circuit declined to find a RICO pattern where an individual allegedly defrauded two corporations in an oil and gas prospecting venture, because the perpetrator's "actions were narrowly directed towards a single fraudulent goal [and] involved a limited purpose." *Id.* at 684. In so ruling, the Fourth Circuit observed that "[i]f the pattern requirement has any force whatsoever, it is to prevent ... ordinary commercial fraud from being transformed into a federal RICO claim.... If we were to recognize a RICO claim based on the narrow fraud alleged here, the pattern re-

quirement would be rendered meaningless." *Id.* at 685 (citations omitted).

 Neither the instant case nor *Edmondson* establishes a *per se* rule for RICO pattern analysis. Instead, the court continues to endorse a case-by-case, fact-specific approach. The six factors prescribed in *Edmondson* should be applied in a manner that is fluid, flexible, and commonsensical, rather than rigid or formulaic. Holding that the district court did not err in ruling that Western failed to allege a pattern of racketeering activity is consistent with this method of analysis.[3] Accordingly, we affirm the order dismissing the complaint.

---

**3.** Western makes no contention that the district court erred in dismissing the non-RICO claims for lack of subject matter jurisdiction. In view of our disposition, we, like the district court, do not reach Market's contention that the complaint is barred by the statute of limitations.