Erik E. KOLAR, Appellant,

v.

PREFERRED REAL ESTATE INVESTMENTS, INC.; Island View Crossing I, L.P.; Preferred Real Estate Developers, L.P.; Lee Park Investors, L.P.; Hamilton–NJ Holdings, L.P.; 240 Princeton Avenue Associates; Hunting Fox Associates V, L.P.; Rivertown Holdings, L.P.; Michael G. O'Neil.

No. 08–3119.

United States Court of Appeals, Third Circuit.

Argued Sept. 30, 2009.

Filed: Jan. 12, 2010.

---

David L. Braverman [ARGUED], Richard S. Julie, Braverman Kaskey, P.C., Philadelphia, PA, for Appellant.

Matthew A. Taylor [ARGUED], Teresa N. Cavanagh, James H. Steigerwald, Robert M. Palumbos, Duane Morris LLP, Philadelphia, PA, for Appellees.

Before: McKEE, CHAGARES, and NYGAARD, Circuit Judges.

OPINION OF THE COURT

CHAGARES, Circuit Judge.

Plaintiff Erik E. Kolar appeals an order of the United States District Court for the Eastern District of Pennsylvania dismissing his claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO" or "Act"), Pub.L. No. 91–452, Title IX, 84 Stat. 941 (1970), *as amended,* 18 U.S.C. §§ 1961–1968, and declining to exercise supplemental jurisdiction over his remaining state-law claims. We will affirm.

## I.

We write for the parties' benefit and set forth only those facts crucial to our analysis. In this procedural posture, we assume as true all well-pleaded facts appearing in the complaint. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009).

Kolar, a Pennsylvania citizen, is in the business of real estate investment. In 1998, he joined defendant Preferred Real Estate Investments, Inc. ("PREI") as a shareholder and the company's president.[1] Defendant Michael G. O'Neil founded PREI in the early 1990's, and at all times relevant here was the corporation's chairman. PREI's business involves the acquisition of real property by single-purpose limited partnerships (the "Affiliates") that are owned by PREI's principals. The Affiliates are governed by separate (albeit substantially identical) partnership agreements, and they generally derive their working capital from PREI's principals, on a pro rata basis, in accordance with each principal's ownership interest.[2] PREI generates revenue through the develop-ment and management of the Affiliates' purchased properties.

Kolar alleges that he owns shares in the following six Affiliates named as defendants in this action (the "Defendant Affiliates"): Island View Crossing, L.P. ("Island View"); Lee Park Investors, L.P. ("LPI"); Hamilton–NJ Holdings, L.P. ("Hamilton"); 240 Princeton Avenue Associates, L.P. ("Princeton"); Hunting Fox Associates V, L.P. ("Hunting Fox"); and Rivertown Holdings, L.P. ("Rivertown"). Kolar also owns a limited partnership interest in PRED and a shareholder interest in Preferred Real Estate Developers, Inc., a 1% general partner of PRED. Finally, Kolar owns minority shareholder interests in the various general partners of the Defendant Affiliates.

In 2005, Kolar resigned his position as an officer, director, and employee of PREI and entered into a Separation and Stock Repurchase Agreement and Mutual General Release ("Separation Agreement") with the company. Under the agreement—which O'Neil executed on PREI's behalf—Kolar retained his equity interests in the various PREI entities (including the Defendant Affiliates), and continued to be entitled to all rights and benefits thereunder. These entitlements included all rights to profit distributions, return of capital contributions, and future equity interests concerning properties that were subject (or in the process of being made subject) to agreements at the time the Separation Agreement was executed.

In September 2007, Kolar filed a 15–count complaint in the District Court

---

1. During the course of this dispute, PREI altered its corporate name. We continue use of PREI herein.

2. Defendant Preferred Real Estate Developers, L.P. ("PRED") is a limited partner of each Affiliate. Because many of PREI's principals have ownership interests in PRED, the Affiliates also generate working capital from those principals (on a pro rata basis) through their ownership shares in PRED.

against O'Neil, PREI, PRED, and the Defendant Affiliates. He asserted several state-law causes of action against various defendants, and three RICO claims against all defendants. Essentially, the complaint alleges that PREI, PRED, and the Defendant Affiliates—under the control and express direction of O'Neil, and in violation of the Separation Agreement and governing partnership agreements—diverted partnership distributions to which Kolar was entitled into other Affiliates in which he had no or smaller interests. Kolar avers that the defendants fraudulently diverted these funds under pretextual claims that he was obligated to fund "capital calls" in connection with his interests in other Affiliates, and that they charged excessive management fees for several of the Affiliates' real-estate ventures. Although he identified several suspect transactions in his complaint, one is of central concern here and warrants further explication.

In 2006, Island View—in which Kolar owned an approximate 30% share through his interest in PRED—entered into an agreement to lease office space to the Lenox Corporation ("Lenox"). Kolar alleges that at the same time the lease agreement (the "Lenox Lease") was executed, defendants—at O'Neil's direction—created an entity for the purpose of acquiring another property owned by Lenox; Kolar was not given an ownership interest in this entity. The property, located at 900 Wheeler Way, Langhorne, Pennsylvania (the "Wheeler Way Property"), had an asking price of $10 million. Kolar alleges, however, that Lenox ultimately sold the Wheeler Way Property to the unknown entity for $5.5 million, and in return received from Island View an above-market $4.5 million lease allowance under the Lenox Lease. Conse-

quently, Kolar complains, Island View—the entity in which he had a substantial interest—indirectly funded the discounted purchase of the Wheeler Way Property by an entity in which he had no interest.

Additionally, he asserts that the defendants caused the unknown entity to sell the Wheeler Way Property quickly for $8 million (a $2.5 million profit) and, despite his demand, did not reimburse Island View for the allowance it granted under the Lenox Lease. Kolar asserts that the structure of this transaction deprived him of at least $1.35 million (30% of $4.5 million), not including lost profits on the sale of the Wheeler Way Property.

The remainder of the complaint's factual allegations regard other transactions undertaken by the Defendant Affiliates and for which Kolar claims he was not properly compensated. For instance, in 2006, LPI sold its primary asset—a property known as Lee Park—to a third party. Kolar alleges that instead of distributing approximately $1.6 million to which he was entitled, the defendants asserted the right to withhold the funds and loan them to other Affiliates. The defendants also allegedly withheld funds from this transaction on the basis that Kolar owed capital-call obligations to other Affiliates. Finally, the complaint alleges that the defendants caused LPI to repay only a fraction of a loan previously made by PRED, further withholding from Kolar distributions owed to him through his interest in that entity.[3]

These transactions form the basis of Kolar's state-law claims, and also underpin his three RICO claims, which he asserts under 18 U.S.C. §§ 1962(a), (c) and (d). Briefly, he claims that together, the

---

**3.** Counts III through VI set forth additional breach-of-contract claims against PREI, PRED, Rivertown, Hamilton, and Princeton. These claims involve similar diversions of

funds and construction management fees allegedly caused by defendants. *See* Compl. ¶¶ 52–77. We do not discuss these allegations in detail.

defendants constituted an association-in-fact enterprise engaged in the real estate business, and whose activities included "acquiring and managing properties, disposing of such properties (usually at a profit,) and diverting proceeds resulting from such dispositions otherwise distributable to [Kolar] to his detriment...." Compl. ¶ 108. The complaint alleges that defendants repeatedly used the mails and wires to further a fraudulent scheme to divert and misappropriate funds rightly owed to him by virtue of his various partnership interests.

The defendants moved in the District Court to dismiss Kolar's complaint under Fed.R.Civ.P. 12(b)(6). The District Court granted the motion, holding that Kolar's RICO claims were legally deficient. Specifically, it found that: (1) the complaint failed to plead an "investment injury" necessary to support a claim under 18 U.S.C. § 1962(a); (2) the alleged enterprise was not "distinct" from the defendant members of the enterprise, undermining Kolar's claim under 18 U.S.C. § 1962(c); (3) the complaint did not plead a scheme to defraud necessary to maintain a RICO claim under 18 U.S.C. §§ 1962(a) and (c) on a mail and wire fraud theory; and (4) because Kolar's substantive RICO claims failed, so too did his conspiracy claim asserted under 18 U.S.C. § 1962(d). Joint Appendix ("JA") 8–14. The District Court then declined to exercise supplemental ju-risdiction over Kolar's state-law claims, and marked the case closed.[4] JA 13. It did not address Kolar's request to file an amended complaint. JA 16. This timely appeal followed.

## II.

RICO provides a private right of action to recover treble damages, attorney's fees, and costs of suit "for any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). "A common thread running throughout § 1962 is that an injured party must demonstrate that the defendant was engaged in a 'pattern of racketeering activity.'" *Tabas v. Tabas,* 47 F.3d 1280, 1289 (3d Cir.1995) (en banc). RICO defines "racketeering activity" by enumerating a litany of predicate acts; relevant here, "racketeering activity" includes any act indictable under 18 U.S.C. §§ 1341 and 1343, the federal mail and wire fraud statutes. 18 U.S.C. § 1961(1)(B). A "pattern of racketeering activity," in turn, "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5); *see also Tabas,* 47 F.3d at 1290.

With this background, we turn to the District Court's disposition of Kolar's RICO claims.[5]

## A.

■ Kolar challenges the District Court's dismissal of his claim under

4. Kolar has since re-filed his state-law claims in the Court of Common Pleas, Philadelphia County. That action is currently pending.

5. The District Court had jurisdiction over Kolar's RICO claims pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331. It had supplemental jurisdiction over Kolar's state-law claims pursuant to 28 U.S.C. § 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291, and our review of the District Court's final order is plenary. *Atkinson v. LaFayette Coll.,* 460 F.3d 447, 451 (3d Cir. 2006). We must accept all well-pleaded facts as true and draw all reasonable inferences in plaintiff's favor, but we may disregard any legal conclusions. *Fowler,* 578 F.3d at 210–11 (discussing *Ashcroft v. Iqbal,* — U.S. —, —, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009)). So long as the complaint sets forth a "plausible" claim to relief, defendants' motion to dismiss must fail. *United States Dep't of Transp. ex rel. Arnold v. CMC Eng'g,* 564 F.3d 673, 676 (3d Cir.2009); *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008).

§ 1962(a) for failure adequately to allege an investment injury. Section 1962(a) makes it "unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use or invest ... any part of such income, or the proceeds of such income" in any enterprise engaged in interstate commerce. 18 U.S.C. § 1962(a). The "provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses...." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir.1991). Because the objectives of § 1962(a) are "directed specifically at the use or investment of racketeering income," it "requires that a plaintiff's injury be caused by the use or investment of income in [an] enterprise." *Id.* (quoting *Rose v. Bartle*, 871 F.2d 331, 358 (3d Cir.1989)); *see also Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir.1993) ("[T]he plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves."); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir. 1991) (rejecting § 1962(a) as a "basis for liability" because "[t]he [pleaded] injury stems from the allegedly fraudulent activities of [defendants], but is not specifically linked to the use or investment of income in any named enterprise.").[6]

Kolar focuses his § 1962(a) claim on the Wheeler Way transaction, described above.

He argues that defendants invested the proceeds of their racketeering activity by causing Island View to grant Lenox an unauthorized $4.5 million allowance under the Lenox Lease in exchange for a concomitant discount on the purchase of the Wheeler Way Property. Thus, he asserts that he effectively funded the discount (in part), as Island View's expected rents would be decreased by $4.5 million over the term of the Lenox Lease (and which were not recouped after the defendants sold the property for an immediate profit of $2.5 million). This, he argues, constituted an "investment injury" sufficient to support his § 1962(a) claim because the diverted funds were effectively "invested" by allowing an unknown entity to purchase the Wheeler Way Property at a substantial discount.

We reject this argument. The harm alleged in the complaint—the rental payments diverted from Island View—is a consequence of the allowance itself, and is not derivative of the uses to which the diverted funds were ultimately put. That the unknown entity later purchased the Wheeler Way Property at a discount equal to the amount misappropriated from Island View is of no moment, for we agree with defendants that the alleged harm had already been inflicted. The nature of Kolar's injury is summarized best in his own brief: "Pursuant to the Island part-

6. Kolar argues that the Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), undercuts a "use or investment injury" requirement. He is incorrect. "A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 496, 105 S.Ct. 3275 (footnote omitted). The Supreme Court in *Sedima* held that § 1962(c) did not require a separate "racketeering injury" because "the compensable injury necessarily is the harm caused by" conduct meeting the four required elements—what the Court termed "the es-

sence of the violation." *Id.* at 497, 105 S.Ct. 3275. For claims asserted under § 1962(a), however, the "essence of the violation" is the investment of racketeering proceeds in an enterprise. Because a plaintiff must have been injured "by reason of" a § 1962(a) violation in order to recover, 18 U.S.C. § 1964(c), Kolar must plead and prove injury flowing from that investment of racketeering proceeds in order to state a claim. We have previously rejected arguments identical to Kolar's, *see Glessner v. Kenny*, 952 F.2d 702, 709 (3d Cir.1991), and we find no cause (nor do we have authority) to change course here.

nership agreement, Mr. Kolar is entitled to certain cash distributions of his share of the partnership's profits. The reduction in rent payable by Lenox as a result of the 'allowance' diminishes Island View's profits, and accordingly, Mr. Kolar's distributions." Kolar Br. at 19. This says nothing of either the investment of the diverted funds or of the purchase and sale of the Wheeler Way Property (for which the diverted funds were used). We must assume as true Kolar's allegation that the defendants ultimately purchased the Wheeler Way Property in part through an investment of the fraudulently obtained discount, but we conclude that the alleged *injury* "is not specifically linked to the use or investment of income in any named enterprise." *Kehr Packages,* 926 F.2d at 1411; *see also Lightning Lube,* 4 F.3d at 1189 (noting that where the defendants allegedly misappropriated and reinvested proprietary business information, "the real injury to the plaintiff is the theft of its property—whatever form it is in—and not the investment of that property in an otherwise legitimate business").

■ We also find unpersuasive Kolar's argument that he suffered an investment injury as a result of Island View's lost opportunity to purchase the Wheeler Way Property at a discount. Because Island View was the entity that granted the allowance under the Lenox Lease, Kolar argues that Island View should have been granted the opportunity to purchase the Wheeler Way Property at a discount. Accordingly, he says, his injury (i.e., the lost investment opportunity) arises directly out of defendants' misappropriated investment. Were we to indulge this argument, however, every investment of fraudulently obtained funds would fall within the ambit of § 1962(a)—a plaintiff could plead that he or she was injured by virtue of the missed opportunity to make the very investment that defendants made with misappropriated monies. We have previously been loathe to expand the scope of § 1962(a) beyond its clear text. *See Brittingham,* 943 F.2d at 305 ("If this remote connection were to suffice, the use-or-investment requirement would be almost completely eviscerated.... If plaintiffs' reinvestment concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless."); *Glessner,* 952 F.2d at 709 ("[I]f investment injury is construed as broadly as plaintiffs suggest, the distinction between sections 1962(a) and 1962(c) would be blurred. We are unwilling to tamper with the congressional scheme."). Today we adhere to our precedent counseling against blurring the divide between §§ 1962(a) and (c). Under the facts as pleaded, Kolar's lost opportunity to invest in the Wheeler Way Property does not constitute an "investment injury" sufficient to support his § 1962(a) claim.[7] Addition-

---

7. Kolar refers us to *Lugosch v. Congel,* 443 F.Supp.2d 254 (N.D.N.Y.2006), arguing that a misappropriation of partnership opportunities can result in an investment injury for § 1962(a) purposes. We have no quarrel with this general proposition. But in *Lugosch* and the case upon which it relies, *Ideal Steel Supply Corp. v. Anza,* 373 F.3d 251 (2d Cir. 2004), *rev'd on other grounds,* 547 U.S. 451, 460–61, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006), the courts permitted a § 1962(a) claim to proceed not simply because a part-

nership opportunity had been misappropriated, but because the misappropriated funds were invested in enterprises geographically near the plaintiffs', which would presumably siphon their customer base and revenues. The district court in *Lugosch* specifically described the nature of the investment injury as follows:

> [T]here is evidence from plaintiffs' expert ... that plaintiffs have been damaged as a result of defendants' diversion of potential corporate opportunities, specifically, the di-

ally, although Kolar argues that "[o]ther examples of 'investment injuries' abound in the [c]omplaint," Kolar Br. at 21, we have reviewed the remainder of his claims, and conclude that he has failed to set forth any injury distinct from that caused by the alleged predicate acts of racketeering activity. The District Court correctly dismissed the § 1962(a) claim.

### B.

■ Section 1962(c) prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). The District Court granted the defendants' motion to dismiss the § 1962(c) claim on two grounds: (1) that the complaint failed to plead an enterprise distinct from the defendants constituting the enterprise; and (2) that the complaint had failed sufficiently to plead a scheme to defraud necessary to support predicate acts of mail and wire fraud. JA 10–14. We may affirm the dismissal on any basis supported by the record, *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir.2000) (en banc), and we do so by holding that Kolar has failed adequately to set forth a pattern of racketeering activity.

In order to plead a violation of § 1962(c), Kolar must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275; *Lum v. Bank*

*of Am.*, 361 F.3d 217, 223 (3d Cir.2004). As stated, a pattern of racketeering activity requires at least two predicate acts of racketeering activity, which include indictable offenses under the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. *See Lum*, 361 F.3d at 223; 18 U.S.C. § 1961(5). Those statutory provisions, in turn, prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. *See Lum*, 361 F.3d at 223. "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (quoting *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 528 (3d Cir.1998) (in turn quoting *Kehr Packages*, 926 F.2d at 1415)). Stated differently, "[t]he scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Kehr Packages*, 926 F.2d at 1415 (quoting *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (in turn quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924))) (internal citation omitted). To establish predicate offenses under §§ 1341 or 1343, it is the scheme that must be fraudulent, not necessarily the particular mail or wire transmissions that constitute the offenses. *See Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d

version .... of the goodwill and infrastructure developed by the existing mall Partnerships by building *adjacent shopping centers, and that plaintiffs may also have been damaged to the extent that stores in S & R centers competed with Partnership Properties and siphoned off their customers.* 443 F.Supp.2d at 270–71 (citing *Anza*, 373 F.3d at 264) (emphasis added); *see also Anza*, 373 F.3d at 264 ("[T]he complaint alleges that defendants used profits gained from the oper-

ation of their ... scheme at National Queens location to fund the opening of the retail outlet *in the Bronx near [plaintiff's] outlet in that borough.* ... The complaint adequately stated a claim on which can be granted under § 1964(c) for a violation of § 1962(a).") (emphasis added). We decline Kolar's invitation to dilute the investment-injury requirement such that § 1962(a) reaches every misappropriation of a business opportunity.

345, 364 (3d Cir.2003).[8] Finally, to establish a "pattern" of predicate acts, Kolar must allege that the acts are related, and amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Tabas*, 47 F.3d at 1292.

We are mindful that "RICO is to be read broadly," *Sedima*, 473 U.S. at 497, 105 S.Ct. 3275, that §§ 1341 and 1343 have been "expansively construed," *Kehr Packages*, 926 F.2d at 1416 (citing *United States v. Boffa*, 688 F.2d 919, 925 (3d Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983)), and that RICO consequently "may be applicable to many 'garden-variety' fraud cases," *Tabas*, 47 F.3d at 1296. By the same token, however, "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Western Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 637 (D.C.Cir.2001) (quoting *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir.2000), *cert. denied*, 532 U.S. 905, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001)). Having scrutinized Kolar's complaint in the light most favorable to him, we conclude that the facts alleged fail to support a RICO claim.

"[S]ince the pattern inquiry must assess whether the defendant's actions amount to or pose a threat of continued criminal activity, it is often helpful to examine the actions which are alleged to form the basis of criminal activity." *Kehr Packages*, 926

F.2d at 1413 (internal citations and quotations omitted). Setting aside for the moment the Wheeler Way transaction, the balance of the complaint sets forth no activity containing any "deceptive elements." *Id.* at 1416. Rather, the essence of Kolar's complaint alleges that defendants have "diverted and/or misappropriated monies ... due and payable" to him under purported claims of contractual right. Compl. ¶¶ 28–29. For instance, the defendants allegedly diverted funds from Kolar, claiming that he owed capital-call obligations in connection with his interests in other Affiliates. *Id.* ¶¶ 28–29, 47, 79, 122–126. Kolar attempts to characterize these contract-based claims of right as "false" and "fraudulent," but we are unpersuaded. Granting all inferences in Kolar's favor, defendants' alleged conduct—even if wrongful as a matter of contract or other state law—was not fraudulent.

The complaint makes clear that defendants asserted (in the e-mails identified in the complaint) the contractual right to use Kolar's distributions to satisfy his purported capital-call obligations. Kolar, on the other hand, claims that he "has no such obligation to satisfy capital calls, *as is plainly set forth in the Separation Agreement and in the applicable Partnership Agreements.*" *Id.* ¶ 29 (emphasis added). The complaint explicitly alleges elsewhere that—in connection with the capital-call withholdings—defendants "falsely assert[ed] [their] ... *entitlement*" to withhold Kolar's distributions and "falsely assert[ed] that Mr. Kolar 'has an *obligation* to fund'" capital shortfalls. *Id.* ¶¶ 123–127 (emphasis added). These allegations set forth disputes sounding in contract.[9]

---

**8.** Additionally, Kolar's allegation of mail and wire fraud must be pleaded with particularity pursuant to Fed. R. Civ. P 9(b). That is, he must plead either the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into [his] allegations of fraud."

*Lum*, 361 F.3d at 224 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984)) (internal quotation marks omitted).

**9.** Moreover, the complaint identifies one e-mail in which the defendants stated to Kolar

Kolar cannot successfully transmute them into RICO claims by simply appending the terms "false" and "fraudulent." *See Lum,* 361 F.3d at 226 (finding that defendants' use of the term "prime rate" was not "reasonably calculated to deceive persons of ordinary prudence and comprehension"); *Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir.1999) ("[T]heft by deception, like a simple breach of contract or intentional interference with contract, is not a predicate act of racketeering activity enumerated in § 1961(1).... We will not read language into § 1961 to federalize every state tort, contract, and criminal law action.") (footnotes omitted); *Kehr Packages,* 926 F.2d at 1416 (dismissing claims against a particular defendant because the alleged actions was not reasonably intended to deceive); *Flip Mortgage Corp. v. McElhone,* 841 F.2d 531, 538 (4th Cir.1988)

("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims."); *Blount Fin. Serv. Inc. v. Walter E. Heller and Co.,* 819 F.2d 151, 152 (6th Cir.1987) (dismissing RICO act in part because "[t]he fact that the parties take different positions under the contract as to the appropriate prime rate, or the fact that the defendant charged too high a 'prime rate' and thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give rise to a valid claim for fraud."); *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract. Its condemnation of a 'scheme or artifice to defraud' implicates only plans calculated to deceive.").[10]

---

that if he wanted to prevent further withholdings, "we suggest that the best option for you is to go to court." Compl. ¶ 123(d). Kolar emphasizes that this statement demonstrates the defendants' intent to continue in their wrongful conduct. This may be true, but the statement and the e-mail's remaining text make explicit that the defendants were actively asserting a contractual right to withhold the funds, and that the threatened conduct was not fraudulent. The e-mail further stated to Kolar that "[i]n future [sic] if you so desire we can hold back monies from properties you will be receiving distributions [sic] *to fund your share of these capital calls.* ..." Compl. ¶ 123(c) (emphasis added, corrections in original). The other e-mails identified in the complaint similarly document defendants' claims of right under the various agreements. While mail or wire transmissions need not themselves be fraudulent to constitute predicate racketeering offenses, the e-mails identified in the complaint affirmatively demonstrate that the defendants' conduct was not "reasonably calculated to deceive a person of ordinary prudence and comprehension." *Kehr Packages,* 926 F.2d at 1416 (quoting *United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir.1978)).

10. We reject Kolar's attempt to characterize the defendants' activity as "embezzlement."

Although embezzlement falls within RICO's reach, *see United States v. Boidi,* 568 F.3d 24, 31 (1st Cir.2009), the Supreme Court in *Carpenter v. United States* reiterated the requirement that an alleged scheme to defraud for mail and wire fraud purposes be accompanied by some form of "trick, deceit, chicane or overreaching." 484 U.S. 19, 26, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (quoting *Hammerschmidt,* 265 U.S. at 188, 44 S.Ct. 511). The Court then repeated the definition of embezzlement: "[T]he *fraudulent* appropriation to one's own use of the money or goods entrusted to one's care by another." *Id.* (quoting *Grin v. Shine,* 187 U.S. 181, 189, 23 S.Ct. 98, 47 L.Ed. 130 (1902)) (emphasis added, internal quotation marks omitted). Kolar's attempt fails, therefore, to shoehorn the defendants' activity into the crime of embezzlement, because the offense also requires fraudulent activity, which we find lacking here.

We also reject Kolar's argument that the complaint adequately set forth predicate mail and wire fraud offenses by virtue of O'Neil's alleged breach of fiduciary duties arising from his controlling position in the PREI organization. We recently held that a corporate officer's breach of fiduciary duties owed to the corporation may suffice to establish honest services fraud under 18 U.S.C. § 1346 (which

Kolar also claims that the defendants withheld partnership disbursements to which he was entitled for the purpose of loaning these funds to other Affiliates, and that the defendants charged wrongful and excessive fees. Compl. ¶¶ 46, 55, 59, 66, 75, 122–129. The complaint unequivocally demonstrates, however, that these alleged actions were also taken under the various contractual agreements between the parties. *See, e.g., id.* ¶¶ 66 ("PREI ... charged a construction management fee of 10%, *in violation of paragraph 5(c) of the Separation Agreement"),* 124(b) (identifying an e-mail that "falsely asserts PREI's ... *entitlement* to withhold approximately $2 million of .... [p]roceeds and to subsequently loan said monies to a variety of partnership in which Mr. Kolar has smaller interests .... ") (emphasis added). These allegations of fraud are deficient for the same reasons as are the capital-call allegations.

▇ Given our discussion, we find a pattern of racketeering activity absent in the complaint. Even accepting, in this proce-

falls within the reach of the mail and wire fraud provisions). *See United States v. McGeehan,* 584 F.3d 560, 570–71 (3d Cir. 2009). The appellants argued there that "not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud," and we did not disagree. *Id.* at 571 n. 10. We "h[e]ld only that a collateral fiduciary duty can provide the source of the honest services owed under §§ 1341, 1343, and 1346." *Id.* We then limited the breadth of our holding in the same discussion: *"In order to give rise to criminal liability, however, the deprivation of honest services must have been the result of a 'scheme or artifice ... with the specific intent to defraud.' "* *Id.* (emphasis added). Accordingly, even if O'Neil's conduct constituted a breach of his fiduciary duties to the PREI partners (and in particular, Kolar), his breach—taken under the purported protection of the various partnership agreements—was not the result of a scheme to defraud. Section 1346 therefore offers Kolar no refuge here.

dural posture, that the complaint sufficiently alleged fraudulent activity surrounding the Wheeler Way transaction, that single, finite transaction cannot by itself underpin a pattern of racketeering activity. *See Efron,* 223 F.3d at 21 ("Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation."); *see also Western Assocs.,* 235 F.3d at 637 ("[W]e do not understand the Supreme Court to disparage interpreting RICO's pattern requirement to guard against finding continuity too easily in the context of a single dishonest undertaking .... " (quoting *Efron,* 223 F.3d at 20)); *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir. 1989) (where the defendant's "actions were narrowly directed towards a single fraudulent goal [and] involved a limited purpose," observing that "if the pattern requirement has any force whatsoever, it is to prevent ... ordinary commercial fraud from being transformed into a federal RICO claim.").[11]

11. Further bolstering our conclusion that Kolar has failed adequately to plead a pattern of racketeering activity is his allegation that the defendants "quickly sold" the Wheeler Way Property to a third party for a substantial profit. Compl. ¶ 35. Because the continuity prong of the pattern analysis is a "centrally temporal concept," *Tabas,* 47 F.3d at 1292 (quoting *H.J., Inc.,* 492 U.S. at 241–42, 109 S.Ct. 2893), the speed with which the defendants finalized the Wheeler Way transaction supports our conclusion that a satisfactory RICO pattern has not been alleged. And as we have already noted, *see supra* note 9, the defendants' tacit threat that they would continue their conduct indefinitely is insufficient to establish open-ended continuity because the threatened continued activity was not fraudulent, and thus not racketeering activity. *See id.* at 1295 ("If a RICO action is brought before a plaintiff can establish long-term criminal conduct, the 'continuity' prong may still be met if a plaintiff can prove a threat of continued *racketeering activity.")* (emphasis added).

For the foregoing reasons, we will affirm the District Court's dismissal of Kolar's § 1962(c) claim.[12]

## C.

■ After dismissing Kolar's claims under §§ 1962(a) and (c), the District Court next addressed his conspiracy claim under § 1962(d). That provision prohibits any person from conspiring to violate subsections (a), (b), or (c). 18 U.S.C. § 1962(d). Quoting our summary statement in *Lightning Lube v. Witco Corp.*, 4 F.3d at 1191, that "[a]ny claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient," the District Court dismissed the § 1962(d) claim. Kolar argues that this was error because a RICO conspiracy claim may lie in the absence of an actionable substantive RICO claim. Given our discussion above, we agree with the District Court's disposition.

It is true that we clarified the scope of our *Lightning Lube* holding in *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 289 (3d Cir.1996). In *Rehkop*, although the plaintiff had adequately pleaded a violation of § 1962(c), he failed to allege a redressable injury from the violation, and thus could not recover under § 1964(c). Relying on *Lightning Lube*, the district court accordingly dismissed the conspiracy claim. Discussing our earlier decision in *Shearin v. E.F. Hutton Group, Inc.*, 885

F.2d 1162 (3d Cir.1989), *abrogated on other grounds, Beck v. Prupis*, 529 U.S. 494, 505–06, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), we vacated the dismissal. We stated:

> The [district] court ... misconstrued our holding in *Lightning Lube*. There we held that in order to state a violation of section 1962(d) for conspiracy to violate subsection (a), (b), or (c), the plaintiff must establish that the defendants violated (or were going to violate) one of those subsections. The problem in *Lightning Lube* was that the actions alleged to constitute violations of subsections 1962(a), (b), and (c) were not violations of these subsections, and thus they also failed to serve as the object of a section 1962(d) conspiracy.
>
> *Lightning Lube* is thus distinguishable. In this case, Rehkop's allegations state a violation of section 1962(c). The reason he cannot pursue such a claim is that he was not harmed by the section 1962(c) violation. Nonetheless, the defendants' alleged violation of section 1962(c) can serve as the object of a section 1962(d) conspiracy, and if Rehkop was harmed by reason of the conspiracy, he may pursue a section 1962(d) claim.
>
> Thus, this case is within *Shearin's* rule that a plaintiff's allegation that he or she was harmed in furtherance of a conspiracy under 1962(d) states a claim for relief under section 1964(c)....

*Rehkop*, 95 F.3d at 290[13]; *cf. Efron*, 223

---

**12.** We note that our discussion of the § 1962(c) claim applies with equal force to the § 1962(a) claim as well. *See* 18 U.S.C. § 1962(a). Given our analysis, we need not pass upon the District Court's alternative bases for dismissing Kolar's substantive RICO claims.

**13.** In *Beck*, the Supreme Court rejected our application of the rule announced in *Shearin* and followed in *Rehkop* (i.e., that the termination of one's employment (a non-racketeering act) is an injury potentially redressable

under RICO's conspiracy provision). 529 U.S. at 505–06, 120 S.Ct. 1608. The Supreme Court held instead that a plaintiff must allege that he or she was injured by an overt conspiratorial act that is independently wrongful under RICO. *Id.* The Court expressly left open, however, the distinct issue presented here: whether a § 1962(d) claim may lie in the absence of an actionable claim under §§ 1962(a)–(c). *Id.* at 506 n. 10, 120 S.Ct. 1608. Thus, although the application of the *Shearin* rule has been overturned by *Beck*, the underlying premise remains sound in this

F.3d at 21 ("A conspiracy claim under section 1962(d) may survive a factfinder's conclusion that there is insufficient evidence to prove a RICO violation ... but if the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails.") (emphasis and internal citations omitted).

Given our resolution of Kolar's §§ 1962(a) and (c) claims above, we conclude that the District Court did not err in dismissing his § 1962(d) claim. Because we agree that Kolar has failed to allege a pattern of racketeering activity, he has consequently failed to establish a substantive violation of §§ 1962(a) or (c). Dismissal of the conspiracy claim was therefore appropriate under *Lightning Lube*.

## III.

■ Kolar argues that he should have been granted leave to amend his complaint. In his brief opposing the defendants' motion to dismiss, Kolar requested—in two of 54 footnotes—that in the event the District Court granted the motion, it permit him to amend his complaint. JA 157 n. 5, 172 n. 38. He also requested leave to amend during oral argument on the motion. JA 298. At no time did he supply the District Court with a proposed amended complaint. The District Court did not address Kolar's request for leave to amend, but instead ordered the clerk to mark the case closed. JA 16.

Relevant here, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2).[14] "Amendments, although liberally granted, rest within the sound discretion of the trial court under Fed.R.Civ.P. 15." *Massarsky v. Gen. Motors. Corp.*, 706 F.2d 111, 125 (3d Cir.1983). Thus, while we would normally review for abuse of discretion, *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir.2000), Kolar argues that because the District Court did not provide an explanation for ignoring his request to amend, its decision is *per se* an abuse of discretion under *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). True, "[w]hile a District Court has substantial leeway in deciding whether to grant leave to amend, when it refuses this type of request without justifying its decision, this action is 'not an exercise of its discretion but an abuse of its discretion.'" *Lake*, 232 F.3d at 373 (quoting *Foman*, 371 U.S. at 182, 83 S.Ct. 227). However, "[n]ot providing a justification for a denial of leave to amend ... does not automatically constitute an abuse of discretion as long as the court's rationale is readily apparent from the record on appeal." *Id.* at 373–74. Accordingly, we have recognized that a plaintiff's "failure to provide a draft amended complaint would be an adequate basis on which the court could deny [his or her] request [to amend]." *Id.* at 374; *see also Fletcher–Harlee*, 482 F.3d at 252 ("[W]e

Circuit: a plaintiff may plead a RICO conspiracy in the absence of an actionable claim under §§ 1962(a)–(c) so long as the complaint complies with *Beck* and the substantive claims fail only for lack of a causative injury. If the substantive RICO claims fail on the merits, as they do here, *Lightning Lube* controls.

14. We reject out of hand Kolar's argument that he is entitled to amend his complaint under Fed.R.Civ.P. 15(a)(1). While Kolar had

the right under that provision to file an amended complaint in response to defendants' motion to dismiss, *see Kelly v. Del. River Joint Comm'n*, 187 F.2d 93, 95 (3d Cir.1951), upon the District Court's order granting the motion and dismissing the complaint, amendment under Rule 15(a)(1) no longer remained an option. *See id.; Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir.2007).

have held that a failure to submit a draft amended complaint is fatal to a request for leave to amend.... Thus, [in prior cases], we held that a district court need not worry about amendment when the plaintiff does not properly request it.... Here, [plaintiff] has not [submitted a draft amended complaint], and its failure to do so is fatal to its request.") (citing cases).

Kolar admits that he failed to supply the District Court with a draft amended complaint, but argues that because defendants did not object to the omission, the issue is waived. We disagree. In the absence of a proper application for leave to amend, there was nothing to which defendants could, or were obligated to, object. *Cf. Ramsgate Court Townhome Ass'n v. W. Chester Borough*, 313 F.3d 157, 161 (3d Cir.2002) ("[Plaintiff] never filed a motion to amend, nor did it provide the district court with a proposed amended complaint. As a consequence, the court had nothing upon which to exercise its discretion."). The burden to supply the District Court with a draft amended complaint rested with the plaintiff; having failed to satisfy this condition precedent, we find that the District Court did not abuse its discretion when it failed to address Kolar's threadbare request to amend.

## IV.

For the foregoing reasons, we will affirm the District Court's order.